1
2
3
4
5
6
7
8                   **UNITED STATES DISTRICT COURT**

9                 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   ARTHUR GERARDO,                           CASE NO. 05 CV 1099 JM (WMc)

12                            Plaintiff,        **REPORT AND**
                                               **RECOMMENDATION OF**
          vs.                                  **UNITED STATES MAGISTRATE**
13                                             **JUDGE RE DENIAL OF**
14   A.K. SCRIBNER, WARDEN,                    **PETITION FOR WRIT OF**
                                               **HABEAS CORPUS**
15                            Defendant.

16

17                                    **I.**

18                            <u>**INTRODUCTION**</u>

19          Arthur Gerardo ("Petitioner"), a state prisoner proceeding *pro se*, brings this Petition for

20   Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. section 2254 challenging his San Diego

21   Superior Court conviction in case number SCN102686.  This Report and Recommendation is

22   submitted to United States District Judge Jeffrey T. Miller pursuant to 28 U.S.C. § 636(b)(1) and

23   Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

24   Petitioner raises the following claims in support of his Petition: (1) violation of Fourteenth

25   Amendment right to due process because there was insufficient evidence to support his conviction

26   for first degree murder under a torture theory and a torture special circumstance; (2) violation of

27   Fourteenth Amendment right to equal protection because the prosecution used peremptory

28   challenges to excuse the only three African-Americans from the jury pool.

After reviewing the Petition and supporting Memorandum of Points and Authorities, Respondent's Answer and supporting Memorandum of Points and Authorities ("Answer"), and all supporting documents submitted by the parties, **IT IS RECOMMENDED** that the Petition be **DENIED** for the reasons set forth below.

## II.

## STATE COURT PROCEEDINGS

Petitioner was convicted by a jury of first degree murder (CAL. PENAL CODE § 187(a)), manufacturing methamphetamine (CAL. HEALTH AND SAFETY CODE § 11379.6(a)), and possession of methamphetamine for sale (CAL. HEALTH AND SAFETY CODE § 11378). The jury found true allegations that Petitioner intentionally murdered the victim and that the murder involved infliction of torture (CAL. PENAL CODE § 190.2(a)(18)). It also found that in the commission of the murder, Petitioner intentionally discharged a firearm (CAL. PENAL CODE § 12022.53(d)), personally used a firearm (CAL. PENAL CODE § 12022.5(a)(1)), and personally used a knife (CAL. PENAL CODE § 12022(b)(1)). The jury also found true the allegations that Petitioner was armed with a firearm in the commission of the murder (CAL. PENAL CODE § 12022(a)(1)) and personally armed with a firearm in the commission of the two drug offenses (CAL. PENAL CODE § 12022(c)). Petitioner was sentenced to life in prison without parole for the murder count; a consecutive term of twenty-five years to life for intentionally discharging a firearm (CAL. PENAL CODE § 12022.53(d)); and a consecutive term of ten years, eight months for the remaining counts and enhancements.

On February 18, 2003, the California Court of Appeal, Fourth Appellate District, Division One affirmed the judgment.

On April 30, 2003, the California Supreme Court denied Petitioner's petition for review of his claim alleging racially discriminatory use of peremptory challenges by the prosecution.

On March 23, 2005, the California Supreme Court denied Petitioner's petition for writ of habeas corpus regarding his insufficiency of evidence claim, citing *In re Dixon*, 41 Cal. 2d 756 (Cal. 1953) (stating that, absent special circumstances, habeas relief will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction), and *In re Waltreus*, 62 Cal. 2d 218 (Cal. 1965) (stating habeas corpus cannot ordinarily serve as a

second appeal).

### III.

### FEDERAL COURT PROCEEDINGS

On May 18, 2005, Petitioner filed the instant Petition and a supporting Memorandum of Points and Authorities in the United District Court for the Central District of California. On May 23, 2005, the Petition was transferred to this Court. On December 20, 2005, Respondent filed an Answer to the Petition along with a Memorandum of Points and Authorities.

### IV.

### STATEMENT OF FACTS

Title 28, United States Code, section 2254, subsection (e)(1) provides: "[A] determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see also Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc) *overruled on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings."). The following facts are taken from the California Court of Appeal's opinion in Petitioner's direct appeal.

On August 28, 1999, Steven Lewis was picking up a friend at her house on South Ditmar Street in Oceanside, California. After he exited his car, he heard a commotion from Petitioner's house located across the street. The noises stopped and Lewis started to walk away when a woman later identified as Valerie Beidler (Petitioner's girlfriend), burst out the front screen door and jumped in front of another screen door on the porch with her arms flared. At that time, Lewis heard a man screaming, "Help me. Help me. They're trying to kill me." (*People v. Gerardo*, No. SCN102686, slip op. at 3.) The man was beating on the screen door causing it to come off its hinges and Beidler was blocking his way. The man hit the front window with his fists three or four times, sliding down as he was hitting. The noises then stopped. Beidler turned to Lewis and his friend and said in an excited manner, "It is just the dogs and the kids." (*Id*. at 3-4.) Lewis

called police from his friend's house and reported what he had heard.  He did not hear any gunshots.

Oceanside Police Department Detective Richard Browning, then a patrol sergeant, came to Petitioner's house in response to the call.  He knocked and rang the doorbell without any response.  Another officer who had arrived in the meantime saw a shadow move away from the front window as Detective Browning knocked.  Eventually, the officers observed Petitioner climbing over the backyard fence toward them.  Petitioner claimed to have been fighting with his girlfriend, who was in the house, and he showed the officers abrasions on the back of his hands.  When questioned, Petitioner told Detective Browning that only his girlfriend was in the house.

After Petitioner refused permission to search, Detective Browning unlocked and entered the house using keys obtained from Beidler.  As he entered the house, he saw Steven Sandoz's bloody body lying on the floor and blood on the floor and walls.  In that room, police found several .32-caliber shell casings and live .32-caliber rounds on the floor and a .22-caliber Super "X" round.  An armoire marked with fresh blood spatters was blocking a door from the room to the outside front porch.  A bloody Philips head screwdriver was found on the floor under the door from the front porch.  Paramedics confirmed the body had no pulse.

Sandoz died from multiple gunshot and stab wounds.  He had seventy-one stab wounds; according to the forensic pathologist who examined his body, fifty-two of those wounds had a significant depth and the others would cause pain to a human.  Sandoz had only a few shallow stab wounds inflicted after his death.  He also had four gunshot wounds inflicted before his death–two to the head, one to his right front chest, and one to his back right shoulder.  The gunshot wounds to his head were consistent with shots fired from a .22-caliber pistol through a pillow; one of those shots was probably the last wound inflicted and would have been almost immediately fatal.  The gunshot to Sandoz's chest traveled into his right upper arm and shattered the bone, rendering his right arm useless.  That wound was consistent with a shot from a .32-caliber pistol.  Sandoz had hemorrhaged profusely from this wound for minutes.

Sandoz had numerous stab wounds to his head and neck, also inflicted before his death.  The forensic examiner described the vast majority of these as simple wounds, meaning Sandoz

was not moving while the knife was stabbing in and out.  One of the more serious neck wounds was a complex wound, indicating Sandoz was moving while the knife was moving.  That wound injured his carotid artery and would have caused death in about fifteen minutes.  The remaining stab wounds would have caused a person to bleed to death in approximately the same time frame. Sandoz also suffered numerous stab wounds to his torso before his death, including fifteen shallow wounds to his abdomen.  Given the bunching and orientation of the stab wounds over Sandoz's body, the forensic pathologist testified they were consistent with a scenario where the person with the knife had control over Sandoz while inflicting wounds in rapid succession.  According to the forensic pathologist, it would have taken a person several minutes to inflict all of the stab wounds, which would have caused Sandoz to bleed to death within ten to twenty minutes if he had not been shot.

Sandoz suffered blunt force trauma–contusions, lacerations, and abrasions–to his head and face, and a contusion to the head of his penis consistent with being kicked in the groin.  He had blunt force trauma to his back, right forearm, left shoulder and elbow, left hand, and his right leg and knee.  He had a broken jaw consistent with blunt force to the front of his chin area.  The blunt force trauma to Sandoz's head occurred before his death.  It would have caused Sandoz to become dazed, confused, and panicked by the sight of blood.

Police found bloody clothes, a cellular telephone, a dagger with fresh blood on its handle, a .32-caliber semiautomatic handgun, and a Browning .22-caliber handgun under a sink in the master bathroom.  The Browning firearm was loaded with six Super "X," .22-caliber rounds.  The .32-caliber handgun was jammed.  It had fresh blood on its grip and slide and several hairs stuck to it.  Investigators also found an answering machine in the house containing a tape with Petitioner's recorded voice on it.  He said something about having a problem with Sandoz.  Officers and detectives also discovered drug-related evidence.  In the master bedroom, they found a shot glass with methamphetamine residue and two baggies, one containing an unspecified amount of methamphetamine residue and the other an unspecified amount of methamphetamine and dimethylsulfone, a commonly used cutting agent.  On a dresser shelf in the same room, they found a baggie containing .07 grams of methamphetamine.  They found a baggie with an unspecified

amount of methamphetamine and amphetamine in a jewelry box in the master bathroom.  In the

master bedroom closet, officers found a letter ending with the initials "AA" stating:

> Steve, Don made a mistake on the break down. It should have been split the way we
> discussed. Don got half off the top and we split the other half three ways. You need
> to start picking up after yourself. I don't like the way the kitchen was and Valerie . .
> . isn't the one who is supposed to clean up around here. You stacked up with dirty
> dishes and chips [sic] all over the floor. I would expect more respect and support in
> regards to keeping this house up. Please get back to me ASAP in regards to all of
> this.

(*Id*. at 7-8.)

In connection with an investigation into other possible criminal activity by Petitioner and

Beidler, Oceanside Police Department Detective Kim Rainwater testified she had interviewed

Sophie Valdovinos, who had been at Petitioner's house to retrieve some items she had given to

Beidler.  Valdovinos told the detective that on that occasion, she heard Beidler tell Petitioner they

"couldn't trust someone anymore, they were being set up and they needed to get rid of that person."

(*Id*. at 9.)

Petitioner and Beidler were then tried together for the charges discussed previously.  The

jury for the trial was selected from two venires; the twelve sitting members from a panel of

seventy-five prospective jurors and the alternates from another panel of fifteen prospective jurors.

During selection from the first venire, the prosecution exercised peremptory challenges against the

only two prospective jurors that had identified themselves as African-American on their

questionnaires (jurors number twelve and sixty-nine).  Neither defendant objected at the time these

jurors were excused and the twelve members of the jury were sworn.

Juror number twelve, Kim L., was married with four children, lived in Oceanside, and

worked as a civilian supervisor at Camp Pendleton.  She reported her son had been shot by an

unknown person but survived; that her car had been burglarized; and in-laws had law enforcement

experience.  With regard to explicit photographs and language, she wrote:  "This question is the

one thing that bothers me the most in serving on a jury.  Seeing pictures and other material of a person who has lost their life, terrifies me.  When the judge said what the case would be about chills ran through my body."  (*Id*. at 16 n.6.)  Responding to whether she was willing to serve as a juror on the case, she circled "Yes" and "No" and wrote she was "really not sure if [she could] handle the murder part of this trial."  (*Id*.)

Juror number sixty-nine, Andrew S., was single with one child, also lived in Oceanside, and worked as a retail clerk.  He reported he had received non-judicial punishment while in the Marine Corps; had "served . . . time" for brandishing a weapon and another crime; had a girlfriend whose husband tried to kill her and then commit suicide; had a sister-in-law who was stabbed numerous times; and had a bad experience with law enforcement in that he was detained after receiving a speeding ticket because the officer "believed [he] was a dealer."  (*Id*.)  His father had been a victim of assault.  Both Kim L. and Andrew S. stated they were unaware of any reason why they could not be fair and impartial jurors.

After the court excused the initial venire, it called for an additional panel of fifteen prospective jurors from which to pick three alternates.  One of the fifteen members of the panel, Charlotte T. (juror number seven), identified herself as African-American.  She was a married teacher with a postgraduate degree in education, lived in Oceanside, and had served as an alternate juror in a previous murder trial.  In private voir dire, Charlotte T. explained that about five years earlier she had been involved in an altercation with a woman at a credit bureau agency over a misunderstanding; that the incident led to shoving or similar contact; and she was charged, tried, and convicted of a misdemeanor at the Vista courthouse where the present trial would take place.  She was placed on probation, paid a fine, and performed community service.  Charlotte T. was represented in that proceeding by a lawyer who had been appointed to counsel a witness in the present case.  Although she had testified on her own behalf and lost, she stated she did not have bad feelings about the court system or how justice is served.

The prosecution exercised its third peremptory challenge to excuse Charlotte T. prompting the following exchange:

[Petitioner's counsel]:  Your honor, I object to the prosecution's exclusion of juror no. 7 under Batson versus Kentucky and People versus Wheeler, but relying on the federal right Batson . Juror no. 7 is African[-]American. The--there were two other African[-]American jurors who survived cause challenges were subject to peremptories in the initial jury. The prosecution used peremptory challenges to excuse both of those jurors, juror no. 9 [sic, Andrew S., juror no. 69] and juror no. 12 [Kim L.]. Perhaps there should have been a Batson objection made then. I didn't make it and that is my problem. As to juror no. 7, she is the sole African[-]American juror that is a potential alternate. I asked her specifically if she could be fair to Mr. Grossman [sic ]. That was one of my questions on voir dire in light of her personal situation where she had been accused of a crime and she looked--when I asked, she looked squarely at Mr. Grossman [sic ] and said she could be fair to him. I submit under Batson.

[Beidler's counsel]:  I join.

[Prosecutor]:  I don't think there has been a prima facie case.

[The Court]:  I will find based on the numbers, sheer numbers involved and the fact that there–she is the last remaining African[-]American, that a prima facie case has been shown.

[Prosecutor]:  The record will reflect neither one of the defendants are African[-]American.

[The Court]:  I understand that.

[Prosecutor]:  Okay.

[The Court]:  I think Batson made clear if Wheeler wasn't clear enough the race of the defendant has nothing to do with the race and/or class of the potential juror.

[Prosecutor]:  I understand the court's ruling. If the court wishes me to justify that particular kick, I would express to the court that I was concerned although she said that she could be fair, she did go to trial by the same prosecuting agency that is prosecuting here. Whether she could be fair or not, that is not someone that I feel strategically I want on my jury as an alternate or as a juror. No. 2, the fact that she was not only charged by my office but charged by the Vista office. I notice that she said that she was represented by Lynn Behymer. Mr. Behymer is counseling a witness on this case. I don't know if his name is going to be mentioned. That was not as big a concern as my first concern. It was a concern, whether or not she said she could be fair in light of Mr. Behymer being involved. The sheer connection with Mr. Behymer. For all of those reasons, that is why I chose to exercise my peremptory, not based upon race at all whatsoever.

[The Court]:  The Batson challenge is overruled. The court finds there is sufficient ground for a peremptory. Thank you.

(*Id.* at 17-18.)

## V.

## DISCUSSION

**A.  Petitioner's insufficient evidence claim is procedurally barred.**

Petitioner claims that his Fourteenth Amendment right to due process was violated because there was insufficient evidence to support his conviction for first degree murder under a torture theory and a torture special circumstance.  (Petition at 21.)  He asserts that there was insufficient

1    evidence that his crime was committed with "a willful, deliberate, and premeditated intent to

2    inflict extreme and prolonged pain."  (*Id*. at 24.)  Petitioner argues that the facts are more

3    consistent with a sudden explosion of extreme violence and a "frenzied fight to the death,"

4    pointing to the combination of severe and superficial wounds inflicted in rapid succession with

5    three different weapons.  (*Id*. at 25.)  Petitioner asserts that there is no evidence that he

6    "prolonged" the victim's death–instead he argues that fatal or potentially fatal wounds were

7    inflicted with the .32 caliber handgun, the .22 caliber handgun, and the knife, all showing a "strong

8    intent to kill" rather than to torture.  (*Id*.)

9         Petitioner further argues that there is no evidence that the killing was done for revenge,

10   extortion, persuasion, or any other sadistic purpose.  (*Id*. at 28.)  Petitioner acknowledges that

11   "there must have been some type of dispute between [Petitioner] and Sandoz," but that no direct

12   evidence of such a dispute was put forth making any conclusion purely speculative.  (*Id*. at 29.)

13        Petitioner also claims that for the reasons previously discussed, there was insufficient

14   evidence to support the torture special circumstance.  (*Id*.)

15        Based on the previous arguments, Petitioner claims that his first degree murder conviction

16   and torture circumstance should be reversed because there is a reasonable probability that the jury

17   found Petitioner guilty solely based on the theory of murder by torture.  (*Id*. at 30.)  Both murder

18   by torture and deliberate and premeditated murder theories were presented to the jury, but

19   Petitioner claims that since the jury found true the torture special circumstance, it likely accepted

20   the murder by torture theory, which Petitioner claims is unsupported by the evidence.  (*Id*.)

21        Respondent contends that Petitioner's insufficiency claim is procedurally barred because

22   he failed to present it to the California Supreme Court on direct appeal.  (Answer at 8.)

23   Respondent acknowledges that Petitioner raised the claim to the California Supreme Court in a

24   state habeas petition, but claims that this does not constitute a substitute and is therefore barred

25   because it could have been raised on direct appeal.  (*Id*. at 8-9.)  Respondent further asserts that the

26   state procedural bar is independent of federal law and adequate because Petitioner did not meet his

27   burden to make "specific factual allegations demonstrating any alleged inadequacy."  (*Id*. at 9.)

28   Finally, Respondent contends that Petitioner has not shown cause or prejudice to overcome the

state procedural bar because there was no external impedance to compliance with the state rule and there was not a "fundamental miscarriage of justice." (*Id*. at 10.)

Alternatively, Respondent claims that there is sufficient evidence to support the conviction for murder by torture. (*Id*. at 11.) Respondent points to the large number of wounds inflicted while Sandoz was still alive–seventy-one stab wounds, multiple blunt force injuries, and two non-fatal gunshot wounds–arguing that they show the intent to prolong the pain, as the time needed to inflict all of the wounds would have been "appreciable." (*Id*. at 12-13.) Respondent also asserts that Petitioner switched weapons at least three times, Sandoz had time to attempt to open the drapes, window, and door, and that forensic evidence showed Sandoz was dragged or moved about the floor throughout the incident while Petitioner was often kneeling. (*Id*. at 13, 15.)

Respondent also contends that there was sufficient evidence suggesting Petitioner committed the crime for revenge and sadistic purposes. (*Id*. at 13.) Respondent asserts that Petitioner planned and prepared to torture Sandoz, as every door and window in the house was locked, all the drapes were drawn, and Petitioner had previously gathered all the weapons he planned to use. (*Id*.) Respondent further claims that evidence suggested Petitioner was unhappy with his "split" of the proceeds from some enterprise and thought Sandoz disrespected him and was setting him up. (*Id*.) Respondent also contends that Petitioner was angry about Sandoz spending a lot of money and wished to "get rid" of him. (*Id*.)

Respondent further claims that the jury had sufficient evidence to find Petitioner guilty of premeditated and deliberate murder even if the evidence was insufficient for a conviction of torture murder. (*Id*. at 17.) Because of this, Respondent contends that the judgment of conviction is valid, as the record does not "affirmatively demonstrate" that the jury relied on an unsupported theory. (*Id*.) Respondent points to the planning, the motive of revenge discussed previously, a document found on Petitioner's computer instructing on how to kill someone, and Petitioner concealing the weapons, changing clothes, and washing off blood following the murder. (*Id*. at 17-18.) Respondent asserts that this evidence of motive, planning, and method is sufficient to support Petitioner's first degree murder conviction based on a premeditation and deliberation theory. (*Id*. at 18.)

05 CV 1099 JM (WMc)

1    Respondent also claims that because of Petitioner's intent, discussed previously, there was

2    sufficient evidence to support the torture special circumstance.  (*Id*.)

3    **1.  Standard**

4    When a state court's rejection of a federal claim involves a violation of a state procedural

5    rule which is adequate to support the judgment and independent of federal law, a habeas petitioner

6    has procedurally defaulted his claim.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  A

7    state procedural rule is "independent" if it is not interwoven with federal law.  *LaCrosse v.*

8    *Kernan*, 244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate" if it is "clear,

9    consistently applied, and well-established" at the time of the default.  *Calderon v. United States*

10   *Dist. Court*, 96 F.3d 1126, 1129 (9th Cir. 1996).  If the Court finds that the procedural bar is

11   adequate and independent so as to support a procedural default, federal habeas review of the claim

12   is foreclosed unless Petitioner "can demonstrate cause for the default and actual prejudice as a

13   result of the alleged violation of federal law, or demonstrate that failure to consider the claims will

14   result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

15   **2.  <u>Independent</u>**

16   For a state procedural rule to be "independent," the state law basis for the decision must

17   not be interwoven with federal law.  *Harris v. Reed*, 489 U.S. 255, 265 (1989).  A ground is

18   "interwoven" with federal law if the state has made application of the procedural bar depend on an

19   antecedent ruling on federal law, such as the determination of whether federal constitutional error

20   has been committed.  *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985); *Bennett v. Mueller*, 322 F.3d 573,

21   580 (9th Cir. 2003), *cert. denied*, 124 S. Ct. 105 (2003).

22   In *Bennett*, the Ninth Circuit discussed in dicta that the rule from *In re Dixon*, 41 Cal. 2d

23   756 (Cal. 1953), may be independent.  The *Bennett* court noted that the California Supreme Court

24   in *In re Robbins*, 18 Cal. 4th 770 (Cal. 1998), had also attempted to establish the adequacy and

25   independence of the *Dixon* Rule.  *Bennett*, 322 F.3d at 581.  In *Robbins*, the California Supreme

26   Court held that California courts would no longer determine whether an error alleged in a state

27   petition constituted a federal constitutional violation, and thus would not consider federal law in

28   denying a habeas petition on *Dixon* grounds.  *Robbins*, 28 Cal. 4th at 811.  The Ninth Circuit has

partially vindicated the California Supreme Court's interpretation of *Dixon* by holding that the *Lindley* Rule, which provides that a claim of insufficiency of the evidence can only be considered on direct appeal, is adequate and independent. *Carter v. Giurbino*, 385 F.3d 1194 (9th Cir. 2004). Therefore, the Court finds the *Dixon* bar to be independent insofar as it applies to the claim in this case.

### 3. Adequate

"A state procedural rule constitutes an adequate bar to federal habeas review if it was 'firmly established and regularly followed' at the time it was applied by the state court." *Poland v. Stewart*, 169 F.3d 574, 585 (9th Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 424 (1991)). Imposing the requirement of clear and consistent application of the bar at the time of the petitioner's default ensures that the petitioner was "apprised of its existence." *Ford*, 498 U.S. at 423. A procedural bar must be "sufficiently clear as to put a petitioner on notice that he must raise all claims or risk default . . . ." *Bargas v. Burns*, 179 F.3d 1207, 1212 (9th Cir. 1999).

Precedent requires that federal review of whether a procedural rule was firmly established and regularly followed should be "limited to the language of the state court opinions." *Bennett*, 322 F.3d at 584; *Valerio v. Crawford*, 306 F.3d 742, 774-75 (9th Cir. 2002) (en banc). Under *Bennett*, the state bears the ultimate burden of proving the affirmative defense that the claimed procedural bar is adequate. *Bennett*, 322 F.3d at 585-86. The petitioner, however, bears an interim burden to place the defense "in issue" after the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense. *Id* at 586. The petitioner may satisfy this burden by "asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." *Id*.

In the present case, Respondent has pled the affirmative defense of the *Dixon* Rule as an independent and adequate state procedural bar. Petitioner, therefore, has the burden of placing the defense "in issue" by citing authority demonstrating its inconsistent application. Nowhere in the record, however, does Petitioner challenge the state procedural bar as inadequate. Accordingly, the Court finds the *Dixon* Rule to be adequate. Petitioner may detail any facts he wishes this Court

1  to consider in determining the adequacy of the *Dixon* Rule in his Objections to Report and

2  Recommendation.

3      Because the *Dixon* Rule is independent and adequate, the Court finds that Petitioner's

4  claim is procedurally defaulted in this Court.

5      **4.** <u>**Cause**</u>

6      Even if a state procedural bar is found adequate and independent, a federal court can still reach

7  the merits of a petitioner's claim, if the petitioner can show "cause and prejudice" or a "fundamental

8  miscarriage of justice" to excuse the procedural default. *McCleskey v. Zant*, 499 U.S. 467, 493 (1991).

9  The "cause" prong is satisfied if Petitioner demonstrates some "objective factor" that precluded him

10  from raising his claims in state court, such as interference by state officials that make compliance with

11  a state procedural rule impracticable or constitutionally ineffective counsel. *Id.* Presently, Petitioner

12  has made no attempt to demonstrate cause. However, Petitioner may do so in his Objections to Report

13  and Recommendation.

14      **5.** <u>**Prejudice**</u>

15      Even if Petitioner establishes cause for his procedural default, he must also establish *actual*

16  prejudice. *Id.* at 494 (emphasis added). To establish the prejudice necessary to overcome a

17  procedural default, Petitioner must show "not merely that the errors at his trial created a *possibility*

18  of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire

19  trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)

20  (discussing prejudice where defendant failed to object to jury instructions in proceeding under 28

21  U.S.C. § 2255). "Prejudice [to excuse claims procedurally barred in a habeas case] is actual harm

22  resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).

23      Petitioner has failed to establish cause for his procedural default in the record. As a result,

24  the Court need not discuss actual prejudice. *Thomas v. Lewis*, 945 F.2d 1119, 1123 n.10 (9th Cir.

25  1991). However, Petitioner may attempt to show prejudice in his Objections to Report and

26  Recommendation.

27      **6.** <u>**Fundamental Miscarriage of Justice**</u>

28      The Court may also reach the merits of Petitioner's procedurally defaulted claims if

- 14 -

1  Petitioner can demonstrate that the failure to do so would result in a fundamental miscarriage of

2  justice.  The Supreme Court has limited the "miscarriage of justice" exception to habeas

3  petitioners who can show that "a constitutional violation has probably resulted in the conviction of

4  one who is actually innocent."  *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  "Actual innocence"

5  means factual innocence, not merely legal insufficiency; a mere showing of reasonable doubt is

6  not enough.  *See Wood v. Hall*, 130 F.3d 373, 379 (9th Cir. 1997).

7          To show actual innocence, Petitioner must show that it is more likely than not that no

8  reasonable juror would have found him guilty beyond a reasonable doubt.  *Id.*  As set forth above,

9  Petitioner's defaulted claims do not allege *factual innocence*.  However, Petitioner may attempt to

10  show a fundamental miscarriage of justice in his Objections to Report and Recommendation.

11  **B.  Petitioner's Fourteenth Amendment rights were not violated during jury selection
   because he failed to put forth an objection to the jurors challenged in the initial venire and**

12  **the trial judge made an adequate inquiry into the African-American juror challenged during
   the second venire.**

13          Petitioner claims that his Fourteenth Amendment right to equal protection was violated

14  when the prosecution used peremptory challenges to exclude the only three potential African-

15  American jurors.  (Petition at 32.)  Petitioner asserts that the trial court erred by not questioning

16  the prosecutor about his reasons for challenging the two African-Americans in the initial venire

17  after a *prima facie* case of discrimination was made with respect to the alternate juror in the

18  second venire.  (*Id.* at 36.)  Further, Petitioner claims that by not inquiring about the prosecutor's

19  reasons for challenging the two African-American jurors in the initial venire, the judge made no

20  "sincere and reasoned attempt to evaluate" the prosecutor's explanation of the challenge to the

21  alternate juror.  (*Id.* at 38-39.)  Petitioner claims that, if the judge had inquired about the previous

22  challenges, a pattern of discrimination could have been established from a consistent pattern of

23  weak or marginal explanations.  (*Id.* at 39.)

24          Respondent argues that Petitioner waived all claims with respect to the two African-

25  Americans challenged during the initial venire because he failed to object at the time.  (Answer at

26  23.)  Respondent further asserts that, even if Petitioner's objection to the sole African-American in

27  the second venire constituted an objection to the two challenged previously, he failed to establish a

28  *prima facie* case on the record regarding the initial challenges.  (*Id.* at 24.)  Finally, Respondent

1   contends that, if there was a pattern of discrimination, it was apparent during the initial venire

2   when the only two African-Americans were challenged; it did not only become apparent during

3   the second venire.  (*Id*.)  For this reason, Respondent asserts that Petitioner cannot be excused

4   from the requirement of making a timely objection.  (*Id*. at 24-25.)

5       Respondent also argues that the trial court performed an adequate inquiry into the

6   peremptory challenge of the alternate juror in the second venire.  (*Id*. at 25.)  Respondent asserts

7   that the potential juror had previously been prosecuted by the same office that was prosecuting

8   Petitioner which might have caused her to harbor bad feelings.  (*Id*.)  Further, Respondent

9   contends that the potential juror had previously been represented by a lawyer who was

10  representing a key prosecution witness, which may have impaired her neutrality or forced the

11  lawyer to withdraw causing a mistrial or delay.  (*Id*. at 25-26.)

12      Title 28, United States Code, § 2254, sets forth the following scope of review for federal

13  habeas corpus claims:[1]

15          The Supreme Court, a Justice thereof, a circuit judge,
            or a district court shall entertain an application for a
16          writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court only on the
            ground that he is in custody in violation of the
17          Constitution or laws or treaties of the United States.

18          [...]

19            (d) An application for a writ of habeas corpus on
            behalf of a person in custody pursuant to the
20          judgment of a State court shall not be granted with
            respect to any claim that was adjudicated on the
            merits in State court proceedings unless the
21          adjudication of the claim—

22              (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
23          determined by the Supreme Court of the United States; or

24              (2) resulted in a decision that was based on an
            unreasonable determination of the facts in light of the
            evidence presented in the State court proceeding.

26  28 U.S.C. § 2254(a), (d)(1)-(2).

---

[1]Title 28, United States Code, § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas corpus petitions filed after 1996.  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  The current Petition was filed on May 18, 2005 and is therefore governed by the AEDPA.

Failure to make a timely objection to an improper, race-based peremptory challenge results in waiving the right to raise that claim on appeal. *People v. Anderson*, 25 Cal. 4th 543, 568 (Cal. 2001) (citing *People v. Bolin*, 18 Cal. 4th 297, 316 (Cal. 1998)). The objection or motion, to be timely, must be made "at the latest, before jury selection is completed." *People v. Gore*, 18 Cal. App. 4th 692, 703 (1993). The general rule is that "where a court has indicated that a trial will be conducted with alternate jurors, the impanelment of the jury is not deemed complete until the alternates are selected and sworn." *Id.*; *see also* People v. Rodriguez, 50 Cal. App. 4th 1013 (1996).

In the present case, based on the reasoning in *Gore*, Petitioner's counsel could have made a timely objection during the second venire to the peremptory challenges that were made during the initial venire. However, Petitioner's counsel instead only objected to the challenge of the alternate juror in the second venire stating:

> Your honor, I object to the prosecution's exclusion of juror no. 7 under Batson versus Kentucky and People versus Wheeler, but relying on the federal right Batson . Juror no. 7 is African[-]American. The--there were two other African[-]American jurors who survived cause challenges were subject to peremptories in the initial jury. The prosecution used peremptory challenges to excuse both of those jurors, juror no. 9 [sic, Andrew S., juror no. 69] and juror no. 12 [Kim L.]. Perhaps there should have been a Batson objection made then. I didn't make it and that is my problem. As to juror no. 7, she is the sole African[-]American juror that is a potential alternate. I asked her specifically if she could be fair to Mr. Grossman [sic ]. That was one of my questions on voir dire in light of her personal situation where she had been accused of a crime and she looked--when I asked, she looked squarely at Mr. Grossman [sic ] and said she could be fair to him. I submit under Batson.

Unlike in *Gore* and *Rodriguez*, where an objection was made extending back to challenges during the initial venire, Petitioner's counsel acknowledged that no objection was made in the first venire, that "perhaps there should have been a Batson objection made then," and that the failure to object was his problem. He made no attempt to make an objection, establish a *prima facie* case of discrimination, or cure his perceived failure with respect to the initial venire. For these reasons, the state appellate court's determination that Petitioner waived his right to appeal the claim of improper, race-based peremptory challenges during the initial venire was not based on an unreasonable determination of the facts.

Further, because no objection was made to the challenges in the initial venire, the trial

judge was *not* required to determine the prosecutor's reasons for those challenges when considering the challenge to the alternate juror.  Once the opponent of a peremptory challenge makes out a *prima facie* case of racial discrimination, the party seeking to justify the challenge must offer a race-neutral reason for the challenge.  *People v. Allen*, 115 Cal. App. 4th 542, 547 (2004).  The trial judge must then make a "sincere and reasoned attempt" to evaluate the race-neutral reasons in light of the circumstances.  *Id.* at 547-48.  A reasoned attempt to evaluate the explanation requires the court to "address the *challenged jurors individually* to determine whether any one of them has been improperly excluded."  *Id.* (emphasis added).

In the present case, no objection was made as to the peremptory challenges in the initial venire.  Therefore, the trial judge was not obligated to inquire about the prosecutor's reasons for the challenges when the alternate juror was challenged.  Further, the trial judge evaluated the prosecutor's explanation for challenging the alternate juror.  The prosecutor put forth two race-neutral reasons for his challenge which the trial judge considered:  1) the alternate juror went to trial against the same prosecuting agency that was prosecuting Petitioner, and, 2) the alternate juror was represented by an attorney who was also counseling a prosecution witness in Petitioner's case.  Because the trial judge evaluated the explanation for challenging the alternate juror and was not required to evaluate the explanation for challenging the jurors in the initial venire, the state appellate court's determination that the trial judge did not fail to engage in a "sincere and reasoned attempt" to evaluate the prosecutor's reasons was not based on an unreasonable determination of the facts.

**IV.**
**CONCLUSION AND RECOMMENDATION**

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **December 4, 2006** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

1      **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

2  and served on all parties no later than **December 22, 2006**.  The  parties  are  advised that failure

3  to file objections with the specified time may waive the right to raise those objections on appeal of

4  the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951

5  F.2d 1153, 1156 (9th Cir. 1991).

6

7  DATED:  October 25, 2006

8

9  _____

10

11                                          Hon. William McCurine, Jr.
                                            U.S. Magistrate Judge
12                                          United States District Court

13  CC:          DISTRICT JUDGE JEFFREY T. MILLER
14               ALL PARTIES

15

16

17

18

19

20

21

22

23

24

25

26

27

28